## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| MARQUETTE CHAPMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 7:17-cv-01631-LSC |
| | ) | |
| THE STATE OF ALABAMA, | ) | |
| | ) | |
| *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OF OPINION

Plaintiff Marquette Chapman ("Plaintiff" or "Chapman") brings suit against the State of Alabama ("Alabama") and the Alabama Department of Transportation ("ALDOT") (collectively "Defendants"), alleging discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*[1] Before the Court is Defendants' motion for summary judgment. (Doc. 24.) The motion has been briefed and is ripe for review. For the reasons stated below,

---

[1] Defendants' Brief in Support of Motion for Summary Judgment argues that Alabama is independently due to be dismissed because "only ALDOT was Chapman's employer and not the state generally." (Doc. 25 at 1 n.1.) However, this issue has not been adequately briefed by the parties, and the Court will assume for the purposes of summary judgment that both Alabama and ALDOT were Chapman's employers under Title VII. The Court notes that this assumption has no impact on the Court's analysis or conclusions.

Defendants' motion for summary judgment is due to be granted.

## I.  BACKGROUND[2]

Marquette Chapman ("Chapman") is an African-American female and a resident of Moundville, Alabama. (Doc. 26 Ex. 1 at 11.) She began her employment with ALDOT on March 22, 2004, as an Engineering Assistant in Tuscaloosa, Alabama. (Doc. 23 at 1, 3.) On March 1, 2007, Chapman was reclassified as an Engineering Assistant I. (Doc. 23 at 3.) On April 16, 2007, Chapman was promoted to Engineering Assistant II/III. (*Id.*) On March 1, 2013, Chapman's position was reclassified as an Engineering Assistant II ("EA II") project inspector. (*Id.*) The essential functions of this position require driving state vehicles to project sites to inspect contractor performance. (Doc. 26 Ex. 37 at 3.) As a result, the Form 40 employment survey for Chapman's EA II project inspector position lists "Valid Driver's License" as a requirement for the position. (Doc. 26 Ex. 11.)

Promotion to a new classification within ALDOT requires an employee to (1)

---

[2]      The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*,  17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . ." (internal quotations omitted)).

turn in an application, (2) meet the minimum qualifications, (3) complete any test necessary for the classification, (4) score high enough to appear in the top ten on the employment register for the areas selected by the applicant ("Certificate of Eligibles"), and (5) be considered and selected from the Certificate of Eligibles. (Doc. 26 Ex. 35 at 4.) A person who appears on the Certificate of Eligibles may be rejected if she cannot meet the requirements of the position as described in the corresponding Form 40 employment survey. (*Id.* at 5.) When seeking to fill a vacant position, ALDOT requests a Certificate of Eligibles from the State Personnel Department in the classification, option, and location for a vacant position it is seeking to fill. (*Id.*) ALDOT cannot appoint a person to a position unless they appear on the Certificate of Eligibles. (*Id.*)

In December 2015, Chapman took a promotional exam for the Transportation Technologist ("TT") classification. (Doc. 23 at 3.) As with the EA II classification, work under a TT classification involves operating a state vehicle to inspect ALDOT project sites, and the Form 40 for a TT assistant project manager therefore lists "Valid Driver's License" as a requirement. (Doc. 26 Ex. 23; Ex. 37 at 3.) On January 21, 2016, Chapman was placed on TT registers for the locations preferences she selected: Baldwin, Clarke, Escambia, Mobile, Tuscaloosa, and Washington Counties. (Doc. 26 Ex. 35 at 5.) In February 2016, Chapman learned that her score

on the promotional exam was the highest in the state. (Doc. 26 Ex. 1 at 80.) In the

ensuing months, Chapman repeatedly noted her high exam scores to her supervisors,

but none recommended her for promotion. (*Id.* at 143–45.)

In the period before and after Chapman took the promotional exam, several of

her white coworkers were promoted to the TT classification. Kim Palmer was

promoted to the TT classification on March 20, 2012, from the register for

Tuscaloosa County. (Doc. 26 Ex. 19.)[3] Monica Weaver was promoted to the TT

classification on August 1, 2014, from the register for Tuscaloosa County. (Doc. 26

Ex. 18.) Randy Brown was promoted to the TT classification on March 7, 2016, from

the register for Pickens County. (Doc. 26 Ex. 24.) And Kim King was promoted to

the TT classification on April 15, 2016, from the register for Tuscaloosa County.

(Doc. 26 Ex. 22.) The parties agree that all four of these employees held a valid

driver's license "at all relevant time periods." (Doc. 23 at 5.) Further, of the four

identified coworkers, Chapman's name appeared only on the Certificate of Eligibles

from which Kim King was selected for promotion. (Doc. 35 at 5, 7–8.)

On February 4, 2016, Chapman's driver's license was suspended. (*Id.*) On

March 1, 2016, her regional office was informed by the central office that Chapman

---

[3]     The Undisputed Materials Facts section in the parties' Joint Status Report indicates that
Kim Palmer was promoted to the TT classification on September 6, 2016. (Doc. 23 at 5.)
However, evidence in the record reveals that Ms. Palmer instead received her promotion to TT,
*Senior* ("TT, Sr.") on September 6, 2016. (Doc. 26 Ex. 20.)

did not possess a valid driver's license. (*Id.*) Chapman's suspended driver's license soon took a toll on workplace efficiency, as Chapman needed other inspectors to drive her to inspection sites. (Doc. 26 Ex. 36 at 3–4.)

On March 9, 2016, Chapman's supervisor, Jon Wesley Huffman, met with her regarding her suspended license. (*Id.* at 2.) On March 24, 2016, Chapman received a formal warning regarding her suspended license and was given six months to obtain a valid driver's license. (Doc. 23 at 4.) Within the same month, Defendants transferred Chapman from her office position to a position in the docking area. (Doc. 26 Ex. 1 at 114–17.) Despite this transfer, Chapman retained her EA II classification and all accompanying requirements. (*Id.*)

During the period after Chapman was transferred to the docking area, Chapman learned of four white male coworkers who had been caught playing cards during work hours. (*Id.* at 218–20.) Each of these coworkers received only a write-up for their misconduct. (*Id.*) Keith Hoggle, a supervisor under whom Chapman also worked, was responsible for issuing the write-ups. (*Id.*)

Later, in a letter dated September 27, 2016, Chapman informed her supervisor that her license could not be reinstated until March 1, 2017. (Doc. 23 at 4.) On October 7, more than six months after Chapman was given the formal warning, Chapman was given ten more days to have her driver's license reinstated. (*Id.*)

On October 20, 2016, Chapman was given a suspension notice for violating 670-x-19-.01(1)(a)8 of the General Work Rules for failure to perform her job properly. (*Id.*) That same day, she was also found in violation of 670-x-19-.01(1)(a)4 for violating specific department rules. (*Id.*) On November 18, 2016, Chapman was suspended for violating 670-x-19-.01(1)(a)8 and 670-x-19-.01(1)(a)4 of the General Work Rules. (*Id.*) She received thirty additional days from November 23, 2016 to have her driver's license reinstated. (*Id.*) On January 11, 2017, Chapman was terminated from ALDOT for violating General Work Rules 670-x-19-.01(1)(a)8 and 670-x-19-.01(1)(a)4. (*Id.* at 4–5.)

On February 23, 2017, Chapman filed a charge of discrimination against ALDOT alleging that "(1) she was discriminated against due to her race in not receiving a promotion to a Transportation Technologist ("TT") position naming two white females as comparators, (2) she was transferred to work in a different area in her position that required a driver's license, and (3) she was subsequently terminated due to the transfer because she did not have her driver's license." (Doc. 26 Ex. 15.)[4] Chapman's license was reinstated on March 2, 2017. (Doc. 23 at 5.)

---

[4]     The Undisputed Material Facts section of the parties' Joint Status Report states that Chapman filed her EEOC charge on March 2, 2017. (Doc. 23 at 5.) However, the face of the EEOC charge indicates that Chapman filed it on February 23, 2017. (Doc. 26 Ex. 15.) The Court accepts as true that the EEOC charge was filed on the earlier date and notes that this fact does not impact the Court's analysis.

However, due to a 2015 automobile accident, an insurance company had placed a hold on Chapman's license, and she did not resolve that issue until the end of 2018. (Doc. 26 Ex. 1 at 211–13.)

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms.*, Inc., 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal*

*Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III. DISCUSSION

### A. Failure to Promote

Absent direct evidence of discrimination, a plaintiff asserting a disparate treatment claim will typically need to satisfy the burden-shifting *McDonnell Douglas*

framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). In exceptional cases, however, a plaintiff may also be able to escape summary judgment if she can otherwise present "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

In order to establish a prima facie case of discrimination for a promotion claim, a plaintiff must show: "(1) that the plaintiff belongs to a protected class; (2) that she applied for and was qualified for a promotion; (3) that she was rejected despite her qualifications; and (4) that other equally or less-qualified employees outside her class were promoted." *Brown v. Alabama Dept. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010). The comparators for the fourth prong must be "similarly situated in all relevant aspects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

Before the Court can examine whether Chapman has established her prima facie case, it must first determine whether her failure to promote claim is timely. Federal law "requires that a Title VII plaintiff file a charge with the Equal Employment Opportunity Commission (EEOC) either 180 or 300 days 'after the alleged unlawful employment practice occurred.'" *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104–05 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)). Because Alabama is a "non-deferral" state, a Title VII plaintiff must file her EEOC charge

within 180 days of the alleged unlawful practice. *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 421 F.3d 1169, 1178 (11th Cir. 2005). A claim is "time barred if it is not filed within these time limits." *Morgan*, 536 U.S. at 109. "A party, therefore, must file a charge within [180 days] of the date of the act or lose the ability to recover for it." *Id.* at 110.

Chapman has alleged that she was repeatedly denied promotion to a TT classification based on her race. Chapman filed her EEOC charge on February 23, 2017. Any failure to promote claim must be based on a promotion occurring on or after August 27, 2016, which is 180 days prior to the filing of her EEOC charge.

Here, Chapman has failed to identify a single coworker outside of her protected class who was promoted to a TT classification on or after August 27, 2016. Chapman has named four white coworkers promoted to the position, but it is undisputed that all named coworkers were promoted well before the relevant period. Kim Palmer was promoted to a TT classification on April 1, 2012.[5] Monica Weaver was promoted to a TT classification on August 1, 2014. Randy Brown was promoted to a TT classification on March 16, 2016. And Kim King was promoted to a TT classification on April 16, 2016. Because all promotions identified by Chapman fall

---

[5]     The Court notes that Kim Palmer's promotion to a TT, Sr. classification did occur within the relevant period on September 6, 2016. (Doc. 26 Ex. 20.) However, the record contains no evidence that Chapman was ever eligible for promotion to a classification even higher than the TT classification.

outside of the relevant period, her claim is therefore untimely.

In her response, Chapman now alleges that Defendants' rolling promotion policy left her eligible for promotion continuously after she scored well on the TT promotional exam. In effect, Chapman alleges a continuing failure to promote for the entire time in which she was eligible to be promoted. *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1221–22 (11th Cir. 2001) ("Federal courts historically have applied the continuing-violation doctrine to permit a plaintiff to recover on an otherwise time-barred claim where at least one of the violations she alleges occurred within the statutory limitations period.").

Chapman has failed to allege a continuing violation in this case. The Supreme Court has expressly stated that "[d]iscrete acts such as . . . failure to promote" must have "occurred" within the relevant period in order to be actionable. *Morgan*, 536 U.S. at 114. The fact that the failure to promote is a "discrete act" belies any attempt to allege that Defendants' failure to promote Chapman was continuous. *See Abram v. Fulton Cty Gov't*, 598 F. App'x 672, 674–75 (11th Cir. 2015) (noting that the Supreme Court's holding in *Morgan* limits the Eleventh Circuit's continuing tort doctrine in the context of discrete acts under Title VII).

Further, the record does not indicate that the alleged violation was continuing. As an initial matter, workplace promotions generally occur only when a position is

available. *See* Ala. Code (1975) § 36-26-23 (linking department promotions with "vacancies in positions"); *see also Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 325 (5th Cir. 2002) ("The nonexistence of an available position is a legitimate reason not to promote."). Moreover, Chapman has failed to present any evidence that Defendants had any policy that allowed her to be promoted even in the absence of a vacant position.[6] Because each coworker Chapman identifies was promoted to the TT classification prior to the relevant EEOC charge period, Chapman's failure to promote claim is time-barred.

Out of an abundance of caution, the Court will also examine the merits of Chapman's claim for racially discriminatory failure to promote. Although Chapman's second amended complaint alleges only discrimination under Title VII, the Court notes that her initial complaint also alleged a claim of racial discrimination under 42 U.S.C. § 1981. Unlike a Title VII claim, a claim under § 1981 is not subject to the time requirements of 42 U.S.C. § 2000e-5(e)(1). However, the *McDonnell Douglas* framework "also applies in § 1981 cases involving discriminatory treatment in employment situations." *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1060 (11th Cir. 1994). Therefore, if Chapman cannot not succeed on the merits of her claim

---

[6]     Chapman's response cites her deposition testimony for the proposition that she could have been promoted at any time after she took the TT promotional exam. (Doc. 27 at 2.) However, the deposition passage to which Chapman cites offers no support for such a proposition. (Doc. 26 Ex. 1 at 133: 6–14.)

under Title VII, she will also fail under § 1981.

As previously stated, Chapman's prima facie case requires her to show that 1) she is a member of a protected class, 2) she was qualified for and applied for a promotion, 3) that she was rejected for that promotion, and 4) that the employer instead promoted someone equally or less qualified who was not a member of Chapman's protected class. *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 963 (11th Cir. 1997). It is undisputed that Chapman is African American and therefore a member of a protected class. However, Chapman cannot demonstrate that she met the remaining elements of her prima facie case.

The second element of Chapman's prima facie case requires her to show that she applied for and was qualified for promotion to a TT classification. *Brown*, 597 F.3d at 1174. With respect to the four examples Chapman identifies in which a white coworker was promoted to a TT classification, Chapman did not apply for three of those promotions. Kim Palmer and Monica Weaver received their TT classifications in 2012 and 2014, respectively. Chapman did not take the TT promotional exam until December 2015, and she thus failed to apply for the TT classifications granted to Palmer and Weaver. Chapman also failed to apply for the TT classification granted to Randy Brown on March 16, 2016. Although Brown's promotion occurred after Chapman applied, Brown received his TT classification in Pickens County.

Chapman did not list Pickens County in her TT application. As a result, Chapman did not appear on the Certificate of Eligibles from which Brown was selected. Therefore, Chapman has failed to satisfy the second element of her prima facie case with respect to these promotions.

In contrast with the other identified TT promotions, Chapman's name appeared on the Certificate of Eligibles from which Kim King was chosen on April 15, 2016, in Tuscaloosa County. Therefore, Chapman has shown that she applied for that promotion. But to satisfy the second element of her prima facie case, Chapman must still demonstrate that she was qualified for a TT classification.

To demonstrate that she was qualified for a TT classification at the prima facie stage, a plaintiff must show that she satisfied an employer's objective qualifications. *Vessels v. Atlanta Independent Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005). "[S]ubjective evaluations play no part in the plaintiff's prima facie case." *Id.* "Rather, they are properly articulated as part of the employer's burden to produce a legitimate race-neutral basis for its decision, then subsequently evaluated as part of the court's pretext inquiry." *Id.*

The Eleventh Circuit has applied the rule in *Vessels* to dismiss claims where plaintiffs failed to meet all objective criteria for employment. *See Trask v. Sec., Dept. of Veterans Affairs*, 822 F.3d 1179, 1192 (11th Cir. 2016). In *Trask*, the plaintiffs were

pharmacists who had sought new pharmacist positions in a program called the PACT initiative. *Id.* at 1184. A requirement for the position was an "advanced scope of practice," which would allow a pharmacist to prescribe medications for a specific disease within their practice. *Id.* at 1186. Because the position involved the independent prescription of medication, an advanced scope was necessary for performing the job. *Id.* at 1192. Moreover, "the objective requirement was made abundantly clear by [the defendant's] pharmacist selections, all of whom had previous experience independently prescribing medication under an advanced scope." *Id.* It was undisputed that the plaintiffs lacked an advanced scope. Instead, the plaintiffs "presented copious amounts of evidence establishing that they were very experienced clinical pharmacists who consistently received outstanding performance reviews." *Id.* Nonetheless, the Eleventh Circuit affirmed summary judgment for the defendants, citing the plaintiffs' failure to meet all objective requirements for the positions. *Id.* at 1196.

Similarly, Chapman has failed to show that she was objectively qualified for promotion to a TT classification. It is undisputed that, during the time that Chapman sought a promotion, she lacked a valid driver's license. The only question remaining is whether having a valid driver's license was an objective requirement for the position. As in *Trask*, the record indicates that possession of a valid driver's license

was one such requirement. The Form 40 employment survey for a TT assistant project manager position lists a "Valid Driver's License" as a requirement for the job. (Doc. 26 Ex. 23.) Such a requirement exists because the essential functions of the assistant project manager position require driving state vehicles to project sites to inspect contractor performance. Without a valid driver's license, the employee cannot operate a state vehicle. As a result, a valid driver's license is necessary for meeting an important function of the position.

Against these undisputed facts, Chapman argues in her response that a written job description is not dispositive and is merely "evidence of the employer's judgment regarding which functions of a job are essential." (Doc. 27 at 3) (quoting *Medearis v. CVS Pharmacies, Inc.*, 646 F. App'x 891, 896 (11th Cir. 2016)). But even assuming that proposition to be true, Chapman still has a burden to show why a valid driver's license was not an objective requirement for her job in practice. And Chapman has not met that burden here.

Chapman has presented no evidence that Defendants excused *anyone* from holding a valid driver's license when a position required one. *See Trask*, 822 F.3d at 1192 (citing employer's consistent hiring of applicants with "advanced scope" as evidence of advanced scope serving as objective requirement). Here, it is undisputed that all four white coworkers identified by Chapman possessed a valid driver's

license at all relevant times.

Moreover, Defendants' handling of Chapman's suspended license is not inconsistent with requiring all TT employees to possess a valid driver's license. Chapman notes that, despite rejecting her promotion based on her suspended license, Defendants continued to permit Chapman to work in other positions requiring a valid driver's license. To be sure, Defendants did allow Chapman to maintain her EA II classification for over eight months on the condition that she have her license reinstated. But that accommodation does not show, as Chapman argues, that Defendants could have promoted Chapman under a similar condition. Although Defendants permitted Chapman a grace period in which she could continue working, they repeatedly warned her that she would face discipline if she failed to have her license reinstated. At all relevant times, Defendants made clear that Chapman had failed to meet a requirement of her position. One expressly conditional accommodation does not beget another, and Defendants were under no obligation to ignore their own objective requirements in determining whether to promote Chapman. Chapman has thus failed to prove the second element of her prima facie case.[7]

---

[7]    Because the Court finds that Chapman has not shown that she was qualified for the promotion that Kim King received, it does not reach the question of whether Kim King was equally or less qualified than Chapman.

Having failed to establish her prima facie case of discrimination, Chapman's claim can only proceed if she has otherwise presented "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (considering plaintiff's claims following earlier en banc decision) (quoting *Smith*, 644 F.3d at 1328). Evidence showing such a mosaic may include "(1) 'suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees; and (3) that the employer's justification is pretextual." *Id.* (quoting *Silverman v. Bd. Of Educ. of City of Chicago*, 637 F.3d 729, 733–34 (7th Cir. 2011)). However, Chapman has not addressed this alternative means of showing discrimination. And for the same reasons that Chapman has failed to show that she was qualified for the TT classification, the Court further finds that she has failed to present a "convincing mosaic" sufficient to withstand summary judgment.

Accordingly, Defendants' motion for summary judgment is due to be granted as to this claim.

**B. Termination**

The Court next turns to Chapman's claim that she was wrongfully terminated from her position as an EA II project inspector. Defendants terminated Chapman's

employment on January 11, 2017, far fewer than 180 days before Chapman filed her EEOC charge on February 23, 2017. Therefore, Chapman's discriminatory termination claim is not time-barred, and the Court will proceed to address the merits of the claim.

To prevail on a disparate treatment claim, a plaintiff typically will need to satisfy the burden-shifting *McDonnell Douglas* framework. *See McDonnell Douglas*, 411 U.S. at 802–04. But a plaintiff may also be able to escape summary judgment if she can otherwise present "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith*, 644 F.3d at 1328.

Under the *McDonnell Douglas* framework, Chapman has the initial burden of establishing a prima facie case of discrimination. Chapman must prove that she: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was treated less favorably than a similarly situated individual outside her protected class. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). Here, it is undisputed that Chapman is African American and therefore a member of a protected class. It is also undisputed that Chapman's termination qualifies as an adverse employment action. Therefore, the Court must next decide whether Chapman has met the second and fourth requirements for her prima facie case.

It is undisputed that, like the TT classification, an EA II classification requires possession of a valid driver's license. (Doc. 26 Ex. 11.) Therefore, for the same reasons that Chapman was not objectively qualified for promotion to a TT classification, the Court finds that she was not objectively qualified to retain her position as an EA II project inspector.

But even if Chapman could show that she was qualified, she has failed to present any similarly situated comparators who were subjected to different treatment. Under the fourth element of a prima facie case, the comparator and the plaintiff must be "similarly situated in all material respects." See *Lewis v. City of Union City*, 918 F.3d 1213, 1226 (11th Cir. 2019) (en banc). Ordinarily a similarly situated comparator: (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff;" (2) "will have been subject to the same employment policy, guideline, or rule as the plaintiff;" (3) "will . . . have been under the jurisdiction of the same supervisor as the plaintiff;" and (4) "will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28 (cleaned up).

Chapman's Amended Complaint alludes to, but does not name, similarly situated individuals who were subjected to disparate disciplinary actions. (Doc. 17 ¶ 26.) In her deposition testimony, Chapman provided details concerning a handful of white coworkers who "were not performing their essential functions" yet still

avoided termination. (Doc. 26 Ex. 1 at 219–20.)[8] Specifically, Chapman testified that "four white male coworkers" were "[p]laying cards in an office" during the workday (*Id.*) Chapman further stated that, when these four white male coworkers were caught, they received only write-ups, as opposed to termination. Said write-ups were given by Keith Hoggle, one of the higher-ranking supervisors for both Chapman and the coworkers.

The Court lacks much of the information helpful in determining whether Chapman and her comparators are similarly situated in all material aspects. Apart from the brief description in Chapman's deposition, the record contains no other evidence relating to the four white male coworkers. For example, Chapman has presented no evidence concerning whether she and her four white male coworkers shared a common work or disciplinary history. Further, the record contains no evidence relating to whether Chapman and her four white male coworkers were disciplined pursuant to the same policy or customs. Although perhaps not fatal, these gaps in information make it more difficult to find in Chapman's favor.

Worse for Chapman is evidence in the record relating to whether Chapman and her comparators worked under the same supervisor. A key consideration is

---

[8] Though pertinent and included in Defendants' evidentiary submissions for this motion, neither party addressed these allegations in the briefing. The Court will do so now.

whether the shared supervisor instigated or conducted disciplinary proceedings for both Chapman and her comparators. *See Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (observing that "disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis"). Chapman's deposition notes that the four white male coworkers received their write-ups from Keith Hoggle, a supervisor under whom Chapman also worked. However, Chapman's disciplinary proceedings began with her immediate supervisor, Jon Wesley Huffman. Thus, for the purposes of determining whether similarly situated comparators exist, Chapman and her four white male coworkers were not subject to the "jurisdiction of the same supervisor." *Lewis*, 918 F.3d at 1227–28.

Moreover, the record does not support Chapman's contention that she and her comparators engaged in the same misconduct. Chapman has presented no evidence indicating that any one of the four white male coworkers was a "similarly-situated non-minority employee who was not terminated after the revocation or suspension of a driver's license." *Martin v. Fed. Exp. Corp.*, 156 F.3d 1230 (6th Cir. 1998) (unpublished). However, it is not clear whether the failure to present a comparator so similarly situated is fatal in this Circuit. The Eleventh Circuit has noted only that similarly situated comparators ordinarily "will have engaged in the same *basic* conduct (or misconduct) as the plaintiff." *Lewis*, 918 F.3d at 1227

(emphasis added). Such language does not demand that the conduct or misconduct must be precisely the same. Indeed, the Eleventh Circuit has remarked that a hypothetical plaintiff terminated for arriving late to work could point to a comparator who routinely leaves work early. *Id.* at 1227 n.13.

The Eleventh Circuit's decision in *Lewis* provides a helpful example of when the conduct or misconduct is meaningfully different between a plaintiff and her comparators. *Id.* at 1213. In *Lewis*, a female African-American officer brought a discriminatory termination claim after she was suspended and then quickly terminated afterwards. For her comparators, the plaintiff identified two white male officers who were similarly suspended but not swiftly terminated thereafter.

In holding that the white male officers were not proper comparators, the Eleventh Circuit cited key differences in their situations, such as the time of their discipline, the policies under which each was disciplined, and the conditions that warranted such discipline. *Id.* at 1230. The latter factor proved the most important. The Eleventh Circuit noted that the plaintiff was placed on administrative leave after a heart condition left her unable to use a department-required taser. *Id.* The white officers, by contrast, failed a required fitness test and were each suspended 90 days to give them time to remedy the issue. *Id.* The "important point" proved to be that the white officers' condition could be remedied, unlike that of the plaintiff. *Id.* Thus,

the Eleventh Circuit held that the plaintiff had failed to present comparators similarly situated in all material aspects. *Id.* at 1231.

The differences in conduct between Chapman and her comparators are even more pronounced than in *Lewis*. Chapman alleged in her deposition that her white male coworkers were caught playing cards during work hours, receiving only a write-up from their supervisor. Chapman, on the other hand, violated a policy requiring a valid driver's license so that she could perform essential functions for her position. Despite repeated warnings, she failed to remedy this problem within eight months and was terminated as a result.

Unlike in *Lewis*, where the discipline of each officer at least arose from a physical infirmity impacting job performance, there are no clear points in common between Chapman's misconduct and that of her comparators. Chapman's deposition testimony attempts to craft one by framing the comparators' misconduct as "not performing their essential functions." (Doc. 26 Ex. 1 at 219–20.) Yet even if the Court accepts that framing, it can only conclude that the misconduct here was meaningfully different. First, the card-playing of the white male coworkers was a single incident, and Chapman has presented no evidence that this misconduct ever repeated. By contrast, Chapman failed to have her driver's license reinstated for months, despite repeated warnings to do so. Second, Chapman does not allege that

her white male coworkers were ever incapable of performing their essential functions, but Chapman's lack of a valid driver's license did render her incapable. (Doc. 26 Ex. 36 at 4–5.) (supervisor's statement that Chapman's lack of valid license harmed office efficiency because coworkers had to drive her to inspection sites). And third, as in *Lewis*, Chapman's lack of a valid license could not be so easily remedied as the white male coworkers' single incident of playing cards. Indeed, Chapman's deposition testimony indicates that an insurance hold on her driver's license left her unable to have it reinstated until over a year after her termination in 2017. Thus, Chapman's misconduct differed meaningfully from that of the four white male coworkers.

Because Chapman and her four white male coworkers differ sharply with respect to their conduct and disciplining supervisors, they are not similarly situated in all material aspects. And because Chapman has failed to provide any other comparators, she cannot meet the fourth element of her prima facie case.

As with her failure to promote claim, Chapman's termination claim can only proceed if she has otherwise presented "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis*, 934 F.3d 1185 (considering plaintiff's claims following earlier en banc decision) (quoting *Smith*, 644 F.3d at 1328). And for the same reasons that Chapman has failed to show

that she was qualified for her position or that similarly situated coworkers faced disparate treatment, the Court further finds that Chapman has failed to present a "convincing mosaic" sufficient to withstand summary judgment on this claim.

Accordingly, Defendants' motion for summary judgment is due to be granted with respect to Chapman's termination claim.

## IV.   CONCLUSION

For the reasons stated above, Defendants' motion (doc. 24) is due to be granted. An order consistent with this opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on October 17, 2019.

L. Scott Coogler
United States District Judge

199455